JODI LINKER, Bar Number 230273
Federal Public Defender
Northern District of California
ANGELA CHUANG, Bar Number 313445
Assistant Federal Public Defender
19th Floor Federal Building - Box 36106
450 Golden Gate Avenue
San Francisco, CA 94102
Telephone:   (415) 436-7700
Facsimile:    (415) 436-7706
Email:        Angela_Chuang@fd.org

Counsel for Defendant Crowder

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| UNITED STATES OF AMERICA, | **Case No.:** CR 23–44 VC |
|---|---|
| Plaintiff, | **DEFENDANT CROWDER'S SENTENCING MEMORANDUM** |
| v. | |
| ASHLEY CROWDER, | **Court:** Courtroom 4, 17th Floor |
| Defendant. | **Hearing Date:** January 29, 2025 |
| | **Hearing Time:** 1:00 p.m. |

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................................i

TABLE OF AUTHORITIES ........................................................................................................ii

INTRODUCTION .......................................................................................................................1

ARGUMENT ...............................................................................................................................2

    I.      A Sentence Of 18 Months Would Be Sufficient But Not Greater Than Necessary To Achieve The Sentencing Goals Of § 3553(a) ...................................................................2

           A.      The nature and circumstances of the offense ........................................................3

           B.      Ms. Crowder's history and characteristics, and her need for treatment...............4

           C.      The Court should waive the interest requirement for restitution ........................11

CONCLUSION...........................................................................................................................11

# TABLE OF AUTHORITIES

## Federal Cases

*Kimbrough v. United States*,
   128 S. Ct. 558 (2007) ................................................................................. 2

*United States v. Booker*,
   543 U.S. 220 (2005) ................................................................................... 2

*United States v. Carty*,
   520 F.3d 984 (9th Cir. 2008) ...................................................................... 2

## Federal Statutes

18 U.S.C. § 3553 ............................................................................... 2, 2-3, 11

18 U.S.C. § 3572 ........................................................................................ 11

18 U.S.C. § 3582 ........................................................................................ 10

18 U.S.C. § 3612 ........................................................................................ 11

## Other Authorities

Donna Jackson Nakazawa, *7 Ways That Childhood Adversity can Affect the Brain*, PSYCHOLOGY TODAY (Aug. 7, 2015) ............................................................................... 7

Emma Tucker & Artemis Moshtaghian, *California Town Prays for Recovery of 2 Kindergartners in Critical Condition After Gunman Opened Fire at Christian School*, CNN (Dec. 7, 2024) .................... 9

Jennifer Huber & Bill Grimm, *Most States Fail to Meet the Mental Health Needs of Foster Children*, NAT'L CENTER FOR YOUTH LAW (2005) ............................................................... 7

John Stirling Jr, MD et al., *Understanding the Behavioral and Emotional Consequences of Child Abuse*, PEDIATRICS (2008). ................................................................... 5

Kaiser Health News, *California Earns Poor Marks on Monitoring the Welfare of Foster Children*, LOS ANGELES DAILY NEWS (October 2, 2017) ........................................... 7

Kristin Turney, PhD & Christopher Wildeman, PhD, *Mental and Physical Health of Children in Foster Care*, PEDIATRICS (2016) ................................................................. 6

Nina Williams-Mbengue, *The Social and Emotional Well-Being of Children in Foster Care*, NAT'L CONFERENCE OF STATE LEGISLATURES ....................................................... 6

1

2

**INTRODUCTION**

The course of Ashley Crowder's life has been repeatedly punctuated with trauma, abuse, and a

lack of the support that she needed to process in a productive way what has happened to her. Over the

four decades of her life, she has been the victim of abuse in every way imaginable—most

egregiously, by the very adults who should have protected her from such mistreatment when she was

a child but who instead perpetrated it upon her. She never had any positive role models that could

have helped her to adjust to and overcome her difficult circumstances. Her mother, who struggled

with drug addiction and numerous mental health issues including schizophrenia, frequently neglected

Ms. Crowder's and her siblings' needs in favor of looking for her next high. The lack of any regular

parental presence in Ms. Crowder's life left her vulnerable to exploitation by others, such as her

neighbor who molested her at five years old while ostensibly babysitting her. That unfortunately

would turn out to only be the first of numerous instances of sexual violence that Ms. Crowder

continued to experience through her childhood and adult life, including at the hands of her own

father, who raped her when she was thirteen years old. Things did not improve after her mother gave

up her parental rights when Ms. Crowder was approaching her teenage years. Chaos and instability

still ruled her life, as she was bounced around to approximately 14 different group homes that did

nothing to address the severe traumas that she had experienced. When Ms. Crowder was 15, she ran

away to San Francisco with a friend and $5 in her pocket, and spent the next several decades

supporting herself through sex work that exposed her to further sexual and physical assaults. Given

this backdrop, it comes as no surprise that Ms. Crowder suffers from an underlying serious drug

addiction and longstanding mental health issues—including severe Post-Traumatic Stress Disorder

("PTSD")—that repeatedly enmeshed her in the criminal justice system and ultimately led her to

commit the instant offense after she had not slept for several days while high on meth and fentanyl.

Ms. Crowder now comes before this Court for sentencing on charges stemming from two

unarmed bank robberies that she committed with her boyfriend/co-defendant, Anthony Fardella, and

a third co-conspirator. Ms. Crowder has never been sentenced to more than 88 days in jail before, and

has sustained only one prior felony conviction for a non-violent charge of false checks/records. The

vast majority of her contacts with the criminal justice system have been crimes of poverty, addiction,

and sex work that she engaged in to survive. The instant offense is out of the norm for her, and with

the benefit of time to look back on what she did, Ms. Crowder is appalled and ashamed that she let

things get so bad that she would resort to this type of conduct. Her underlying mental health and

substance abuse issues got the best of her, and they continued to plague her during the pendency of

this case as she struggled to consistently abate her drug use while on pretrial release. There is no

doubt that her long history of unprocessed trauma, mental health issues, and substance abuse played a

significant role in her poor decision to commit this offense. She deeply regrets what she did and takes

responsibility for her actions, but also asks the Court to take into consideration her personal

circumstances and exceedingly challenging background. Ms. Crowder respectfully requests that the

Court sentence her to 18 months with a recommendation for placement in the Bureau of Prisons

Residential Drug Abuse Treatment Program ("RDAP"), to be followed by three years of supervised

release. Such a sentence is appropriate based on the factors delineated in 18 U.S.C. § 3553(a).

## ARGUMENT

### I.     A Sentence Of 18 Months Would Be Sufficient But Not Greater Than Necessary To Achieve The Sentencing Goals Of § 3553(a)

In sentencing Ms. Crowder, this Court must consider all of the directives set forth in 18 U.S.C.

§ 3553(a); the Guidelines are only one factor among many to be considered by the Court. *See United

States v. Booker*, 543 U.S. 220 (2005); *Kimbrough v. United States*, 128 S. Ct. 558, 570 (2007). "The

overarching statutory charge for a district court is to impose a sentence sufficient, but not greater than

necessary" to achieve the goals of § 3553(a). *United States v. Carty*, 520 F.3d 984, 991 (9th Cir.

2008) (internal quotations omitted). Those goals include the need to: (1) reflect the seriousness of the

offense; (2) promote respect for the law; (3) provide just punishment for the offense; (4) afford

adequate deterrence to criminal conduct; (5) protect the public from further crimes of the defendant;

and (6) provide the defendant with needed educational or vocational training, medical care, or other

correctional treatment in the most effective manner. *See* 18 U.S.C. § 3553(a)(2). Section 3553(a) also

directs the Court to consider additional factors, including: the nature and circumstances of the

offense, § 3553(a)(1); the history and characteristics of the defendant, § 3553(a)(1); the kinds of

sentences available, § 3553(a)(3); the sentencing guideline range, § 3553(a)(4); pertinent Sentencing

Commission policy statements, § 3553(a)(5); the need to avoid unwarranted sentencing disparities, §

1    3553(a)(6); and the need to provide restitution to any victims of the offense, § 3553(a)(7).

2         Ms. Crowder agrees with the Guidelines calculation in the Presentence Report ("PSR"), with a

3    final offense level of 19 and a Criminal History Category ("CHC") of III. *See* PSR ¶¶ 33, 54. The

4    resulting advisory Guidelines range is 37–46 months.[1]

5         **A.      The nature and circumstances of the offense**

6         On November 19, 2022, Ms. Crowder and an unindicted female co-conspirator entered a Bank

7    of America on Van Ness Avenue after being dropped off by Mr. Fardella, who waited outside in the

8    car. *Id.* ¶ 8. Ms. Crowder and the third co-conspirator each passed a demand note to a bank teller. *Id.*

9    In response, a teller gave approximately $1,100 to Ms. Crowder. *Id.* As noted in Mr. Fardella's

10   sentencing submission, the discovery showed one teller "smiling as she received the note" and telling

11   the police shortly afterwards that she "didn't take it seriously." Dkt. No. 126 (Fardella Sent. Mem.) at

12   4. Later that afternoon, Ms. Crowder, Mr. Fardella, and the female co-conspirator all went into an

13   East West Bank on Clement Street. PSR ¶ 12. Similarly to the first bank, the female co-conspirator

14   passed a demand note to a teller while Ms. Crowder and Mr. Fardella engaged two other tellers in

15   conversation. *Id.* The female co-conspirator was given $1,500 in response to her note. *Id.* ¶ 13.

16        That evening, SFPD officers saw a car that they suspected was involved in the robberies. *Id.* ¶

17   15. At the time, Mr. Fardella was in the driver's seat and Ms. Crowder was in the front passenger

18   seat. *Id.* Mr. Fardella then led the police on a chase for several blocks, traveling up to 30 miles per

19   hour in areas with 25-mph speed limits. *Id.* The police eventually used spike strips to stop the car. *Id.*

20   Mr. Fardella physically resisted arrest while Ms. Crowder was arrested without incident. *See id.*

21   During a search of Ms. Crowder, the police recovered $434.60. *Id.* ¶ 16. She later told law

22   enforcement in an interview that she and Mr. Fardella had been looking for drugs when the police

23   spotted them. *Id.* ¶ 18.

24        The offense did not involve the possession or use of any weapons, nor did it involve physical

25   violence or the infliction of injury upon any other person. Nonetheless, Ms. Crowder recognizes the

26   significant detrimental impact that her actions likely had on the bank tellers involved, and

27   ─────────────────

28   [1] Probation has recommended a downward variance to 30 months. PSR Sentencing Recommendation
     at 1.

DEF'S SENT. MEM.
*CROWDER*, CR 23–44 VC

understands that even a threat of violence must been a terrifying and traumatic experience for them. She is enormously remorseful for causing them such pain and distress, and accepts responsibility for doing so. *See* Declaration of Angela Chuang in Support of Defendant Crowder's Sentencing Memorandum ("Chuang Decl."), Ex. A (Ashley Crowder Letter) ("I terrorized innocent people, and I put them in harm's way for no reason other than my own misguided desperation. These people were just doing their jobs, and they did not deserve to be subjected to fear and trauma. They did not deserve to have their lives disrupted by my actions. My behavior caused real emotional and psychological harm to these individuals, and I deeply regret it.").

At the time of the offense, Ms. Crowder's mental state was impaired by drugs that had kept her awake and sleep-deprived for several days. During this period of time in her life, she was regularly abusing DMT, fentanyl, heroin, and meth. *Id.* ¶ 136. By then, her addiction to various controlled substances had consumed much of her life since her adolescence. Ms. Crowder is well aware that her drug addiction and the lengths to which she went to obtain money for more drugs has been at the root of so many of her poor decisions, not the least of which was her participation in this offense. She recognizes the seriousness of her criminal conduct and understands that she must face consequences for what she has done, which she is prepared to do.

Notably, Ms. Crowder has voluntarily chosen to assume the full and sole responsibility for restitution in this matter, demonstrating extraordinary acceptance of responsibility. It is undersigned counsel's understanding that the government has agreed to apply the amount of the forfeited money ($434.60 recovered from Ms. Crowder at the time of arrest) towards the restitution in this case. Accordingly, she asks that the Court order restitution in the amount of $2,165.40— this represents the equivalent of $2600, less the amount that was forfeited.

### B.    Ms. Crowder's history and characteristics, and her need for treatment

Ms. Crowder's history and characteristics clearly call for a significant downward variance. As laid out in painful detail in the PSR as well as a neuropsychological report, Ms. Crowder's entire life has been characterized by instability, abuse, and a staggering amount of trauma. Unsurprisingly, this history led to serious mental health and substance abuse issues that have driven much of her interactions with the criminal justice system. While this case has been pending, Dr. Caroline

1    Salvador-Moses assessed Ms. Crowder's neuropsychological state and diagnosed her with severe

2    PTSD and bipolar disorder. *See* Chuang Decl., Ex. B (Neuropsych Report) at 9–10. Ms. Crowder also

3    has a history of ADHD, which she was diagnosed with in kindergarten. *See id.* at 3. As Dr. Salvador-

4    Moses explains, "Ms. Crowder has a history of substance abuse and involvement in the legal system.

5    Her hardships and challenges can be understood within a context of a significant trauma history.

6    Since a very young age, she has been subjected to severe sexual abuse by different perpetrators as

7    well as incest by her father, maternal substance abuse and mental health issues, poverty and lack of

8    resources." *Id.* at 1–2.

9          Ms. Crowder was born in Huntington Beach, but spent most of her childhood in Chico before

10   she ran away from a CPS group home to San Francisco when she was 15. *Id.* ¶ 117. Her mother had a

11   longstanding drug addiction and used cocaine while Ms. Crowder was in utero. *Id.* ¶ 118. This drug

12   problem continued to be a significant problem after Ms. Crowder's birth, and was further exacerbated

13   by co-occurring mental health issues, including schizophrenia and bipolar disorder. *Id.* As a result,

14   Ms. Crowder and her siblings were frequently neglected; the family relied on food banks and charity

15   for food, and their electricity was often turned off because of unpaid bills. *See id.* Ms. Crowder's

16   father, who similarly suffered from a crack addiction, largely disappeared from the family's life when

17   she was five years old but would show up sporadically after that. *Id.* ¶ 117. During one of those times

18   when he resurfaced, he raped Ms. Crowder and took her virginity when she was 13 years old. *Id.*

19   Sadly, this was not the first time she had been sexually abused by an adult. Her mother would often

20   leave her and her younger sister in the care of a neighbor while she went off to find drugs for herself.

21   *See id.* ¶ 119. This neighbor sexually molested both of the girls when Ms. Crowder was five years

22   old. *Id.* When she was 11, her uncle sexually molested her and was sent to prison for seven years. *Id.*

23   Unsurprisingly, research has found that childhood abuse has ramifications far beyond the abuse itself.

24   Such abuse can result in long-term behavioral issues, mental health issues such as PTSD and

25   substance abuse. *See* John Stirling Jr, MD et al., *Understanding the Behavioral and Emotional*

26   *Consequences of Child Abuse*, PEDIATRICS 122(3), at 667 (2008).[2] Indeed, Ms. Crowder exhibits

27

28

---

[2] Available at https://pediatrics.aappublications.org/content/pediatrics/122/3/667.full.pdf.

1  these negative consequences, such as significant mental health issues including PTSD, as well as a

2  longstanding substance use disorder that began when she was only seven or eight years old. *See*

3  Chuang Decl., Ex. B (Neuropsych Report) at 3.

4      Ms. Crowder's mother eventually gave up her parental rights when Ms. Crowder was 11 or 12

5  years old after CPS became involved. *Id.* ¶ 118. Unfortunately, their intervention did not provide Ms.

6  Crowder with the stability that she needed to feel safe and to recover from the significant amount of

7  trauma that she had already experienced. For the next few years, CPS moved her through

8  approximately 14 different group homes, and she was labeled a high-risk runaway. *Id.* Long-term

9  foster care, though well-intentioned, often leads to greater negative outcomes for a child. *See* Nina

10  Williams-Mbengue, *The Social and Emotional Well-Being of Children in Foster Care*, NAT'L

11  CONFERENCE OF STATE LEGISLATURES, at 2 ("The longer a child is in [foster] placement, the greater

12  the chance that he or she will move from one foster placement to another, placing the child at further

13  risk of negative social and emotional outcomes. Frequent moves mean that the child faces continuing

14  disruption of relationships with friends, siblings and other relatives, coaches, teachers, classmates,

15  religious leaders and others.") (hereinafter *Foster Children Well-Being*);[3] Kristin Turney, PhD &

16  Christopher Wildeman, PhD, *Mental and Physical Health of Children in Foster Care*, PEDIATRICS

17  138(5), at 10 (2016) ("[C]hildren who are in foster care are in significantly worse mental and physical

18  health than children in the general population.").[4] This continued instability in Ms. Crowder's life

19  likely exacerbated the effects that she was already experiencing from the traumas she had suffered.

20      Though she received some mental health treatment while in foster care, it was woefully

21  inadequate to address her needs as is often the case. *See id.* at 3–4 ("Recent research from the

22  National Survey of Child and Adolescent Well-Being finds that children and youth in foster care have

23  high levels of mental health needs and that those needs are not being met. Children and youth in

24  foster care with mental health disorders stay in foster care longer, rely more on expensive residential

25  treatment placement, experience more moves in care, *have higher involvement with the criminal*

26

27

28
---

[3] Available at
https://www.ncsl.org/Portals/1/Documents/cyf/Social_Emotional_WellBeing_Newsletter.pdf.
[4] Available at https://pediatrics.aappublications.org/content/pediatrics/138/5/e20161118.full.pdf.

DEF'S SENT. MEM.
*CROWDER*, CR 23–44 VC

*justice system* and have poorer educational outcomes.") (emphasis added). Significantly, the federal government has found disturbing failures and shortfalls in California's foster care system with regard to monitoring the well-being of foster children and provision of mental health services. Kaiser Health News, *California Earns Poor Marks on Monitoring the Welfare of Foster Children*, LOS ANGELES DAILY NEWS (October 2, 2017, 4:14 PM);[5] Jennifer Huber & Bill Grimm, *Most States Fail to Meet the Mental Health Needs of Foster Children*, NAT'L CENTER FOR YOUTH LAW (2005) (explaining that "[f]ederal reviewers concluded that most states fail to meet the psychological and behavioral treatment needs of child abuse and neglect victims" and noting that "[i]n the California final report . . . a stakeholder remarked that many mental health providers for counseling and therapy do not have sufficient skills").[6]

Ms. Crowder's development of myriad underlying issues also correlates directly with the level of childhood trauma that she experienced. In the mid-1990's, the Centers for Disease Control and Prevention ("CDC") released the results of a groundbreaking study that coined the concept of Adverse Childhood Experiences ("ACEs") and investigated the impacts of those experiences on later-life health and wellbeing. *See About the CDC-Kaiser ACE Study*, CDC (last accessed September 3, 2021).[7] It is now widely accepted that living through one or more of these ACEs has profound and widespread effects on an individual's health as an adult. *See, e.g.*, Donna Jackson Nakazawa, *7 Ways That Childhood Adversity can Affect the Brain*, PSYCHOLOGY TODAY (Aug. 7, 2015) ("The ACE Study tells us that experiencing chronic, unpredictable toxic stress in childhood predisposes us to a constellation of chronic conditions in adulthood."). This effect extends to physical brain development. *Id.* ("Recent magnetic resonance imaging (MRI) studies suggest that the higher an individual's ACE Score, the less gray matter he or she has in other key areas of the brain,

---

[5] Available at https://www.dailynews.com/2017/09/28/california-earns-poor-marks-on-monitoring-the-welfare-of-foster-children/#:~:text=The%20state%20has%20been%20criticized,families%2C%20also%20has%20raised%20concerns.&text=She%20previously%20had%20been%20injured,care%2C%20according%20to%20media%20reports.

[6] Available at https://youthlaw.org/publication/most-states-fail-to-meet-the-mental-health-needs-of-foster-children/.

[7] Available at https://www.cdc.gov/violenceprevention/aces/about.html#:~:text=ACEs%20are%20common%20across%20all,%2C%20learn%2C%20work%20and%20play.

DEF'S SENT. MEM.
*CROWDER*, CR 23–44 VC

including the prefrontal cortex, an area related to decision-making and self-regulatory skills, and the amygdala, or fear-processing center. Kids whose brains have been changed by their Adverse Childhood Experiences are more likely to become adults who find themselves over-reacting to even minor stressors."). The 10 ACEs are: (1) emotional abuse; (2) physical abuse; (3) sexual abuse; (4) mother treated violently; (5) substance abuse in the household; (6) mental illness in the household; (7) parental separation or divorce; (8) incarcerated household member; (9) emotional neglect; (10) physical neglect. *About the CDC-Kaiser ACE Study*, CDC. Amongst the CDC's findings was the following: Someone who faced 4 ACEs was "460 percent more likely to suffer from depression than someone with an ACE score of 0." Nakazawa, *supra*. The PSR places Ms. Crowder's ACEs score at 9—far more than high enough to trigger an increased risk for negative health outcomes, including the heightened likelihood of mental health issues and risky behaviors like drug abuse. *See* PSR ¶ 63; *About the CDC-Kaiser ACE Study*, CDC.

Eventually, Ms. Crowder ran away to San Francisco with a friend when she was just 15 years old with $5 in her pocket. PSR ¶ 120. Not knowing how else to survive, she became an underage sex worker to support herself. This inherently dangerous work continued for years, during which she was sexually and physically assaulted countless times, including multiple incidents where her head was split open. *Id.* This coincided with an increased frequency of law enforcement contacts, as she was arrested for sex work related charges as well as drug charges. Her criminal history tells a clear story—that of a life lived on the fringes, where survival and continued access to drugs were the paramount concerns. Considering the obstacles she has faced in her life, it is no surprise that Ms. Crowder has been battling substance abuse from a very young age. Because she was exposed to drug use by both her parents at an early age, she began using drugs when she only seven or eight years old. Chuang Decl., Ex. B (Neuropsych Report) at 3. This addiction that began when she was in elementary school has followed her and continued to plague her throughout her adolescence and adult life, though she has managed short stints of sobriety at times. *See id.* at 5. These long-term struggles have also tragically resulted in her separation from her four children for most of their lives. The father of her two oldest children is her former pimp who became her boyfriend for some period of time. PSR ¶ 120. Her youngest child was the product of rape. *Id.* ¶ 121. Ms. Crowder lost custody of

1  all of her children due to her ongoing issues with substance abuse, and they were adopted by other

2  families. *Id.* The loss of her children, on top of everything else, has been incredibly challenging for

3  her. *Id.*

4      Despite the extensive trauma that Ms. Crowder has faced, she is not beyond hope for

5  rehabilitation. Far from it. As previously noted, she has been able to achieve sobriety for periods of

6  time in the past and is working towards developing the skills and support system to maintain her

7  sobriety in the future. A significant motivating factor for her to change her life is her close friend and

8  employer, Robert Rago, who has become essentially the most important person in her life in the past

9  decade. Not only does she work for him for his small business, but she also lives with him as a

10  caregiver. *Id.* ¶ 138. Their relationship has no doubt been complicated by her struggles with

11  substance abuse, but he remains supportive of Ms. Crowder. *See* Chuang Decl., Ex. C (Letters of

12  Support, Robert Rago Letter) ("I am asking that Ashley receives [sic] a second chance to redeem

13  herself . . . . She developed a drug problem and this led to a change in her."). Ms. Crowder knows

14  that if she wants to be present in what remains of Mr. Rago's life, that she must confront her

15  addiction and mental health needs on a more permanent basis. Given his advanced age and physical

16  health issues, she worries about him constantly. *See* Chuang Decl., Ex. A (Ashley Crowder Letter) ("I

17  am terrified that he will pass away before I can be there to care for him and support him in the way he

18  deserves. The thought of him enduring his struggles alone because of my actions haunts me every

19  single day."). Ms. Crowder also wants to be able to provide emotional and moral support for her

20  sister, who is recovering from her own drug addiction and whose 6-year-old son (Ms. Crowder's

21  nephew) was shot last month in a school shooting. *See* Emma Tucker & Artemis Moshtaghian,

22  *California Town Prays for Recovery of 2 Kindergartners in Critical Condition After Gunman Opened*

23  *Fire at Christian School*, CNN (Dec. 7, 2024).[8]

24      There is no question that Ms. Crowder needs intensive, consistent dual diagnosis treatment for

25  her underlying mental health and substance abuse issues, which is precisely what Dr. Salvador-Moses

26  also recommends. *See* Chuang Decl., Ex. B (Neuropsych Report) at 11. Nor is there any question that

27

28

---

[8] Available at https://www.cnn.com/2024/12/04/us/california-school-shooting/index.html.

much of her involvement in the criminal justice system, including the instant offense, is a direct result of those underlying problems. It will not be an easy road for her, as her struggles on pretrial release indicate just how deep-seated her addiction truly is. But in the time that she has spent in custody on this matter, which far outstrips any amount of jail time that she has previously served,[9] Ms. Crowder has gained substantial insight into how it came to be that she hit rock bottom and what it will take for her to come back from that. She has established a medication regimen that has helped to stabilize not only her mental health but also her drug cravings. *See* PSR ¶ 126. She has participated in numerous classes that are available to her via distance learning as well as in-person programming with Five Keys,[10] all of which have helped her to build the toolset that she will need to maintain sobriety on the outside. *See* Chuang Decl., Ex. D (Edovo Certificates); Ex. A (Ashley Crowder Letter) ("While incarcerated, I have begun the process of recovery, not just from my addiction but from the broken mindset that allowed me to think these crimes were justifiable. My journey of sobriety has been difficult but it has also opened my eyes to the truth. I have participated in addiction recovery programs and have embraced every opportunity to learn the skills and tools I need to remain sober. I have learned how to identify triggers, how to cope with stress in healthy and constructive ways, and how to build a support system that will help me stay on the right path."). While in-custody programming such as RDAP will play an important role in providing Ms. Crowder with the foundation to be successful upon her release, and she acknowledges that a custodial sentence is warranted, it is axiomatic that "imprisonment is not an appropriate means of promoting correction and rehabilitation." 18 U.S.C. § 3582(a). Her continued recovery upon completion of her custodial sentence will be aided greatly by the resources that the U.S. Probation Office can offer her, and she specifically requests that her supervised release conditions allow for her participation in inpatient treatment programs (not just outpatient) because she recognizes that she may need that higher level of care during her re-entry.

---

[9] Her longest prior jail sentence was 88 days. The 18-month sentence that she requests here is magnitudes greater than that.

[10] Ms. Crowder participated in anger management, substance abuse, and computer classes through Five Keys.

1    **C.    The Court should waive the interest requirement for restitution**

2    Under 18 U.S.C. § 3612(f), a defendant whose sentence includes a fine or restitution generally

3    is required to pay interest. *See* 18 U.S.C. § 3612(f)(1). However, the interest requirement can be

4    modified or waived by a sentencing judge if the Court "determines that the defendant does not have

5    the ability to pay interest . . . ." 18 U.S.C. § 3612(f)(3). Though this particular statute does not specify

6    what factors the Court should consider, it makes sense to turn to the same factors relevant to

7    imposition of a fine or other monetary penalties, which is governed by 18 U.S.C. § 3572 and includes

8    consideration of § 3553(a) sentencing factors.

9    Ms. Crowder qualified for appointed counsel in this matter precisely because she is indigent.

10    She has no assets and her income was limited even prior to her incarceration. *See* PSR ¶¶ 138, 140.

11    The PSR confirms that she does not have the ability to pay a fine. *See* PSR ¶ 141. For someone with

12    scant financial resources like Ms. Crowder, the restitution imposed in this case will be significant—

13    $2,165.40—and compounding interest on top of that would present a significant hardship to Ms.

14    Crowder. Accordingly, because she does not have the ability to pay interest, she requests that the

15    Court waive the interest requirement for restitution pursuant to 18 U.S.C. § 3612(f)(3)(A).

16    **CONCLUSION**

17    For all the reasons set forth above, Ms. Crowder respectfully requests that the Court impose a

18    sentence of 18 months to be followed by three years of supervised release, and order restitution in the

19    amount of $2,165.40. She further requests that the Court recommend that she participate in RDAP,

20    and that she be designated to a facility as close as possible to San Francisco. Such a sentence is

21    sufficient but not greater than necessary to achieve the sentencing goals laid out in § 3553(a).

22

23    Dated:    January 22, 2025    Respectfully submitted,

24    JODI LINKER
      Federal Public Defender
25    Northern District of California

26    /S

27    ANGELA CHUANG
      Assistant Federal Public Defender

28